Honorable Robert J. Morgado Secretary to the Governor
Attached is the report of the Attorney General's Advisory Committee on Ethical Standards with regard to the matter submitted by you on January 27, 1982.
April 26, 1982
Honorable Robert Abrams Attorney General State of New York Department of Law Two World Trade Center New York, New York 10047
Dear Attorney General Abrams:
As a result of a request contained in a letter addressed to you by Mr. Robert J. Morgado, Secretary to the Governor, you asked the Advisory Committee on Ethical Standards to inquire into the terms and conditions relating to the sale and purchase of residential properties by Mr. Morgado in the Albany area, and all other matters relative thereto for the purpose of ascertaining whether there was a violation of any of the provisions of Public Officers Law, Sections 73 and 74.
The Committee has concluded its labors and its members have voted on the question which was submitted. By a vote of 4-3 it was determined that Mr. Morgado did not violate any of the provisions of the above mentioned sections. The minority disagreed and voted that Mr. Morgado did not comply with the high standards set forth in Section 74h. of Public Officers Law.
The Committee was advised by your office that although Dean McKay and Professor Younger were unable to attend any of the Committee's meetings, they were kept abreast of the Committee's activities and received, through your office, the same documents, letters, memos, etc., which were available to the other members. The Committee was also advised by your office that both Dean McKay and Professor Younger would not participate in the voting and in fact did not.
Enclosed are the reports of the majority and the minority setting forth their reasons for their contrary conclusions. It is to be noted that Dick Bartlett, John Smythe, Malcolm Hoenlein and Lita Taracido are the members of the majority and Louis J. Capozzoli, Professor Charles Hamilton and Frank Dowd are members of the minority.
I should like to assure you sir, that every member of the Committee, irrespective of the conclusion reached by him or her, worked long, conscionably and earnestly in endeavoring to reach a fair and just result.
ADVISORY COMMITTEE ON ETHICAL STANDARDS BY:
Louis J. Capozzoli Vice Chairman
 Report to the Attorney General by the Majority MATTER OF ROBERT J. MORGADO Respectfully submitted, Dean Richard Bartlett Lita Taracido Malcolm Hoenlein John Smythe
Date: April 26, 1982
Hon. Robert Abrams New York State Attorney General 2 World Trade Center New York, New York 10047
Dear Mr. Attorney General:
You have asked the Advisory Committee on Ethical Standards for an opinion as to whether the circumstances relating to the sale by Robert J. Morgado, Secretary to the Governor, of his residence in Delmar, New York and the purchase and financing of a new residence in Loudonville, New York indicate any violation of Sections 73 and 74 of the Public Officers Law. The inquiry arises out of the following circumstances.
1) In September, 1980, and thereafter, Robert J. Morgado and Mary Lou Morgado had discussions with Bernard F. Conners, an Albany area businessman, concerning purchase by the Morgados of a new home in the Cobble Hill development in Loudonville owned by British American Development Corporation (BADC). Mr. Conners was chairman of BADC and its majority stockholder. Subsequently, Mr. Conners introduced Mr. Morgado to Francis W. Coughlin, an officer of BADC with whom discussions and negotiations continued. Mr. Conners also introduced Mr. Morgado to James A. Graham, Regional President of Marine Midland Bank regarding availability of a bank mortgage loan for the purchase of the Loudonville property. Mr. Conners was a Regional Director of Marine Midland, and Marine Midland was financing the development of the Cobble Hill project.
2) On December 29, 1980, Mr. Mrs. Morgado executed a contract with BADC for the purchase of a two-acre lot in the Cobble Hill subdivision upon which BADC was to erect a single family residence pursuant to agreed plans and specifications. The consideration was $281,000, of which $100,000 was to be financed by a purchase money second mortgage to be taken back by BADC. The second mortgage was to be interest-free for 2½ years and then bear interest at the rate of 6½% for the remaining 27½ years. The contract was made subject to the buyers obtaining a bank mortgage loan of $140,000. The closing date was to be May 1, 1981. No down payment by the buyers was required and no other payments were to be made before closing. The Morgados were also given the option to sell the property back to BADC for the original purchase price after one year, and within three years of closing.
3) On February 26, 1981, Marine Midland Bank gave the Morgados a commitment letter agreeing to provide a 30-year 14½% mortgage for $140,000. There was a subsequent increase to $160,000, several extensions of time, and the commitment was ultimately increased to $180,000 for 30 years at 15%.
4) In May, 1981, at the direction of Mr. Conners, the Loudonville lot which was the subject of the contract with the Morgados was transferred by BADC to Francis W. Coughlin, Martin J. Glickman and Louis Dempf, Jr. as Trustees, (presumably for Mr. Conners), subject to the mortgage then on the property given by BADC to Marine Midland to secure a building construction loan.
5) Closing of title for the Loudonville property finally took place on September 18, 1981, at which time the Morgados assumed the $180,000 mortgage given by BADC to Marine Midland and gave the Trustees a second mortgage for $100,000. The balance owing of $37,737.22, which included $14,620 for extras ordered by the Morgados, interest and other closing costs, was paid by Mr. Mrs. Morgado giving the Trustees a non-interest bearing demand note. This note was paid shortly after closing of the sale of the Delmar home in November, 1981.
6) The single family residence in Delmar, owned by Mr. Mrs. Morgado was constructed by them in 1968. They listed the property for sale with Picotte Real Estate, Inc. in March, 1981, at an asking price of $99,500. An offer of $86,000 was finally made through another broker, Roberts Real Estate, and this was accepted after Picotte Real Estate offered to waive its usual half commission of $2,800 in return for an exclusive listing of the new Loudonville home, should the Morgados place that property on the market within the next five years.
7) Bernard F. Conners, British American Realty, Ltd. and the Trustees for Bernard F. Conners have leased property to the State of New York, beginning in 1976. The property involved is a warehouse at 550 Broadway and other property at 100 Broadway in which British American is a joint venturer with Mid-City Realty.
8) Picotte Real Estate, Inc. and other Picotte enterprises are major lessors of commercial property to the State of New York in and around the City of Albany, and have been so engaged for many years through several administrations.
9) Prior to January, 1980, Marine Midland was a New York state chartered bank subject to regulation by the Superintendent of Banks. In 1979, Hongkong and Shanghai Banking Corporation applied for state approval of its plan to acquire a controlling interest in Marine Midland. This proposal was supported by Governor Carey. In January, 1980 Marine Midland became a national bank, obviating the need for state approval.
It should be stated that in addition to the information provided by Mr. Morgado, your staff has gathered substantial additional information in response to our requests. Based on the information thus made available to us, we conclude that Mr. Morgado, while he received favored treatment to the extent indicated below, has not violated any of the provisions of Sections 73 or 74 of the Public Officers Law in connection with the sale of his Delmar property or the purchase and financing of his Loudonville property.
We base this conclusion on the following factors:
a) The price paid for the Loudonville property equaled or exceeded fair market value, based on appraisals made available to us.
b) There is no evidence of any connection between the dealings of Bernard F. Conners with the State of New York and the sale of the Loudonville property to the Morgados. The evidence is that the leasing of properties to the State of New York by Mr. Conners or any of his business concerns where arms length transactions made in the ordinary course of business and that Mr. Morgado was in no way involved. It does not appear that Mr. Morgado was involved in the appointment of Mr. Conners to the Olympic Regional Development Authority.
c) There is no evidence of any connection between the dealings of the Picotte enterprises with the State of New York and the broker transaction with the Morgados concerning the sale of the Delmar property. The waiver of its commission by Picotte does not appear to be other than a normal business transaction for which there was consideration. The many leases made between the Picotte concerns and the State of New York over the years appear to have been arms-length transactions made in the ordinary course of business in which Mr. Morgado was not involved.
d) There is no evidence of any connection between the Hongkong and Shanghai-Marine Midland proposal and the mortgage loan subsequently made to Mr. Morgado by Marine Midland. It does not appear that Mr. Morgado had any involvement with either Hongkong and Shanghai Bank or Marine Midland in relation to the application while it was pending before the Superintendent of Banks.
We do note that several factors relating to the purchase and financing of the Loudonville property were unusual when considered together, and amount to the Morgados having received favored treatment from BADC, the Trustees and Marine Midland. These factors were: 1) no down payment requirement and 100% financing of the full cost of the property through first and second mortgages (other than $14,620 for extras); 2) favorable interest rates on both mortgages, considering conditions of the market place at the time; 3) the sell-back option given the Morgados by BADC; and 4) payment of closing costs by the Morgados giving a non-interest bearing demand note to the Trustees. However, we do not find that Mr. Morgado's acceptance of these favorable terms resulted in a violation of the Public Officers Law. Although it appears that no other purchaser was offered the combination of terms which Mr. Morgado benefitted from, one or more of these terms were offered to others to induce purchase in the Cobble Hill Development. Further, no facts were adduced that would lead one to believe that Mr. Morgado used his position to secure privileges or that he could be improperly influenced or that he would likely be engaged in acts that are in a violation of his trust.
In a separate opinion, our colleagues on the committee find a violation of Section 74(3)(h) of the Public Officers Law which states, "an officer . . . . should endeavor to pursue a course of conduct which will not raise suspicion among the public that he is likely to be engaged in acts that are in violation of his trust." However, it must be noted that the conduct proscribed is not that which would give rise to any suspicion of impropriety, however slight or insubstantial, but only the suspicion that the public officer is likely to be acting in violation of his trust.
On balance, therefore, we conclude that the circumstances do not support a finding that Mr. Morgado knowingly or intentionally violated the Public Officers Law nor a reasonable suspicion that he was likely to breach his trust.
However, this incident underscores the need for great sensitivity on the part of public officers with regard to the manner in which they transact personal business. Public officers, particularly those in positions of great authority and responsibility, must take care that their private dealings, when viewed by reasonable persons, will not convey the appearance of impropriety. In short, they should recognize that what may be acceptable transactions as between private citizens may, as here, raise questions when they involve public officers dealing with parties who do business with the state.
 Report to the Attorney General by the Minority MATTER OF ROBERT J. MORGADO
As a result of a request contained in a letter addressed to you by Robert J. Morgado, Secretary to the Governor of the State of New York, dated January 27, 1982, the Advisory Committee on Ethical Standards has been asked by you to inquire into the terms and conditions relating to the sale and purchase of residential properties by Mr. Morgado, in the Albany area, and all other matters relative thereto for the purpose of ascertaining whether there was a violation of any of the provisions of the Public Officers Law, Sections 73 and 74.
The members of the Committee have engaged in a thorough and extensive examination of statements, reports, memos of law, contracts and other material submitted to us for the purpose of carrying out the duties as assigned to us by you.
It appears that Mr. Morgado was involved in two different real estate transactions. He had placed his own house on the market for sale and at about the same time he entered into negotiations to purchase a new house which was to be built according to specifications.
He employed a broker to assist him in selling his house. Some difficulty was experienced in bringing about the sale and by mutual agreement between Mr. Morgado and his broker, a downward modification of the price, which Mr. Morgado had expected, was made and in return only half the commission would be paid to the brokers who brought about the sale. The Committee is unanimous in the finding that no criticism can be levelled against Mr. Morgado for this transaction. We find nothing wrong with his conduct as to this.
We will now discuss the details of the purchase by Mr. Morgado of the house which was to be built. It appears that some vacant land had been purchased earlier by Bernard F. Conners with an intent to build houses. He transferred this land to the British American Development Corporation, which was controlled by him. It appears that Mr. Conners was involved in some business dealings with the State consisting of leases which he entered into as landlord and certain state agencies were tenants. Mr. Conners also served as a member of the New York State Olympic Regional Development Authority. He has also been active in the Governor's re-election campaign.
The contract of sale, based upon agreed specifications, provided that the original price of the house was $140,000., later became $181,000., and the price of the land upon which it was to be built was an additional $100,000. No money was put down by Mr. Morgado either on the land purchase or on the building contract. The $100,000. to be paid for the land was paid for by Mr. Morgado by a Purchase Money Mortgage. It was to be interest-free for 2-½ years and thereafter to bear interest at a rate of 6-½ per cent monthly over a period of 27-½ years.
The price of the house which was to be built was to be financed by a mortgage loan from Marine Midland Bank. This mortgage loan was recommended to be given by the bank by Mr. Conners who was a regional director of the bank. Originally the letter of commitment by the bank was for $140,000. at an interest rate of 14-½ per cent. However, because of modifications in the plans and because of adjustments in price, the eventual mortgage was raised to $181,000. and was to be for a term of 30 years at an interest rate of 14-½ per cent. It is to be noted that by the time the title was closed on the house the prevailing interest rate was 18 per cent. Nevertheless, the bank accepted 15 per cent which was the rate fixed on the closing.
It is clear that Mr. Morgado advanced no money of his own either in the purchase of the land or in the purchase of the house. When title was closed there were some monies due over and above the purchase price because of extras to the house, plus some interest and closing costs. Because the house which Mr. Morgado owned had not been sold at that time instead of paying in cash Mr. Morgado's promissory note was accepted and paid when title was closed to the house sold by Mr. Morgado. This means of payment avoided placing money in escrow which might otherwise have had to be done. It should be noted that Mr. Morgado at the beginning of the transaction provided a financial statement which disclosed that he had assets of $274,000. and liabilities of $100,000.
It was also agreed by the parties that a condition of the sale of the land and the building of the house, Mr. Morgado was given the right to sell the house back to the seller between one and three years after the closing of title, at the original price.
In connection with this examination by the Committee, Mr. Morgado has conceded that as Secretary to the Governor he is subject to the ethical standards of Sections 73 and 74 of the Public Officers Law. Nevertheless, it should be recognized that, as every other citizen, he has a right to make the best deal he can when he is involved in any transaction provided he is not in violation of ethical standards. With this thought in mind it is important to consider the details of the transaction, keeping in mind the language in the noted sections.
There are certain aspects of the transaction that are not usual. It is not normal practice for one to enter into a purchase of a house for over $300,000. with no money of his own being put down either on the purchase of the land or the house, when the mortgage for the construction was given. On the closing date he did give a promissory note that was for extras, etc., as above stated. Subsequently, when title to the house which he sold was closed, he paid that note with the money he then received.
Also, it is not usual for the average bank to give a first mortgage, in the amount involved here, when there is a second mortgage on the property and the buyer has put down no money of his own.
It should be noted that the original letter of commitment from the bank provided for interest at 14-½ per cent and subsequently the final interest agreed upon was 15 per cent, although the prevailing rate was 18 per cent. It is true that that was purely within the discretion of the bank officials and that no adverse inference necessarily flows therefrom. Nevertheless, it was common knowledge that mortgage financing was hard to come by for the average person in the community and for that reason the real estate market was inactive. Bearing in mind the official position of Mr. Morgado, the public might well wonder if that had anything to do with the exercise of discretion in favor of Mr. Morgado. Why was no money put down by Mr. Morgado? The explanation as given by Mr. Coughlin, an associate of Mr. Conners, in the British American Development Corporation, is that while he had no prior contact with Mr. Morgado, he knew of Mr. Morgado's position and no down payment was necessary because he "was known and trusted."
It is argued that no favoritism was shown to Mr. Morgado because two other purchases of property from British American Development Corporation could have similar terms. The record shows that those purchasers, a Dr. Kim and Mr. Hancock, both put down sizeable amounts on the purchase of the land. Dr. Kim put down $50,000. and Mr. Hancock put down $91,000. within three weeks. (See affidavit of Mr. Coughlin, pages 2 and 5.) It is interesting to note that a report made to this Committee by your office indicates that on inquiring of some banks by agents of your office, as to their practice, they indicated that at least 20 per cent is required by them. It is clearly admitted that Mr. Morgado would be useful to the sellers in attracting other buyers because of his official position and standing in the community. This about sums up the reasons why Mr. Morgado was given favorite treatment.
Criticism has also been made by certain segments of the press based on the fact that sometime prior to the questioned transaction Mr. Morgado had interceded on behalf of the Marine Midland Bank to bring about a merger with another bank. That criticism is unfounded because the efforts of Mr. Morgado in this connection were consistent with the announced policy of the Governor. His activities were in the course of the discharge of his duties and therefore, the Committee sees no connection whatever between that and this transaction.
The provision in the contract giving Mr. Morgado the right to sell the house back to the seller is not ordinarily found in contracts to sell houses. We have considered the reasons for Mr. Morgado wanting this option but it must be recognized that this would be regarded by the average person as something not easy to get.
It is of interest to note that the persons principally involved in the purchase of the house by Mr. Morgado and who dealt with him, were mindful of his position and have expressed the thought that they wanted to be careful about their dealings with him so as not to have it appear that he was getting favored treatment. Did not the same thought occur to Mr. Morgado? Should it not have occurred to him during the negotiations, that being the prominent figure he was, the transaction was bound to attract the attention of the public?
The Committee has considered all of the circumstances which have come to its attention and have weighed them in light of the contents of Public Officers Law, Sections 73 and 74, and it is firmly convinced that there was no connection between his official duties and the transaction under examination and there has been no violation by Mr. Morgado of his trust. His actions in this matter have been completely innocent and not illegal in any way. The only question raised herein is whether he exercised good judgment under the circumstances and that has to be measured in the light of the language of Section 74(3)(h), because there is no violation of any of the other provisions contained in Sections 73 and 74. Public Officers Law, Section 74 contains the following language:
 "h. An officer or employee of a state agency . . . should endeavor to pursue a course of conduct which will not raise suspicion among the public that he is likely to be engaged in acts that are in violation of his trust."
The Attorney General, under date of August 1, 1979, commenting on this section said as follows:
 ". . . as has been often stated, a public official must not only be innocent of any wrong doing, but he must be alert at all times so that his actions and conduct give the public no cause for suspicion. He must give no appearance of a potential conflict between his official duties and personal activities even though an actual conflict is not present." See Opinions of the Attorney General, 1979, p 67.
No one can examine this transaction without concluding that the seller of the property was quite anxious to use the position and standing of Mr. Morgado for the purpose of publicizing him as a buyer in an attempt to interest others to buy in that development. We are not concerned with an evaluation of the actions of Messrs. Conners, Coughlin and the bank officials. Our duty is to ascertain whether on all the facts and circumstances made known to us there was a violation by Mr. Morgado of the language found in the last cited section of the Public Officers Law.
The Committee believes that under all the circumstances disclosed, an objective person might well have some suspicion that Mr. Morgado unwittingly allowed himself to be used by the sellers in furthering their business interests.
For these reasons, we conclude that Mr. Morgado did not comply with the high standards set forth in Section 74(3)(h), as is expected from a public official.
Dated: April 23, 1982
 Respectfully submitted, Louis J. Capozzoli, Vice Chairman Charles Hamilton Frank Dowd